# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

---

Tamara L. Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

June 11, 2024

**By ECF**
Hon. Paul A. Engelmayer
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

     Re: <u>United States v. Silfredo Castillo Martinez</u>
        24-Cr-173 (PAE)

Dear Judge Engelmayer:

     Some of Silfredo Castillo Martinez's earliest memories involve being mercilessly mocked for his perceived sexuality. As a child, Mr. Castillo's classmates quickly realized he was "different." Shy and sensitive, Mr. Castillo was bullied, ostracized, and called a "faggot." Things were hardly better at home: Mr. Castillo's deeply religious family told him that homosexuality was one of the worst sins a person could commit. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, Mr. Castillo withdrew socially and suppressed his homosexuality. He had few friends his own age as he shuttled between family members in different countries, and spent over a decade hiding his identity. He became depressed and occasionally suicidal.

     Mr. Castillo spent his adulthood closeted, anxious, filled with shame over his identity, and increasingly isolated from anyone other than his coworkers and family. He became addicted to pornography, which became his only sexual outlet. Men in group chats began sending him sexual images involving children. As he became desensitized to the images, Mr. Castillo – who medical professionals opine may have suppressed memories of his own childhood trauma, and who suffers from "arrested development" – did something he deeply regrets. He filmed himself having oral sex with an eleven-year-old boy.

     Mr. Castillo has never tried to minimize the gravity of his terrible decision. Instead, he accepted responsibility for his actions and committed himself to addressing the underlying issues that led to his behavior. He has pled guilty in both state and federal court, and his acceptance of responsibility has been a relief to the victim and the victim's mother. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

     Mr. Castillo is going to serve twenty years in state prison for the same actions that are the subject of the federal prosecution. Considering his difficult background, lack of criminal record,

mental health struggles, and commitment to change, a sentence of 180 months concurrent with his state sentence would be sufficient but not greater than necessary.

## I. FACTUAL BACKGROUND.

### A. Mr. Castillo's upbringing was marred by isolation, repressed trauma, untreated psychiatric issues, and shame about his sexuality.

Silfredo Castillo Martinez was born in a village in the Dominican Republic in 1990. His father, Jose, was a neglectful and adulterous alcoholic; his mother, Marisol, suffered from severe anxiety and depression. Jose moved to the United States when Silfredo was just one year old, leaving Silfredo and Marisol behind. Jose started a new life and had two daughters with a different woman, maintaining only sporadic phone contact with Silfredo. The first time Silfredo remembers meeting his father in person was when he was nine years old; there was a knock on the door and Marisol told him, "This is your dad."

Silfredo grew up in poverty in a village prone to power outages and where running water was only available a few hours per week. Marisol tried her best to provide for Silfredo, but her mental illness made the young boy's life difficult. Silfredo often came home to find her sobbing uncontrollably, and he would try to comfort his mother as she lay curled in the corner of her room. Other times, Marisol would fly into fits of rage and inflict what Silfredo now calls "corporal punishment" but was obviously abuse: she would whip him with a belt and switch and beat him with her shoes for minor transgressions.

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
Marisol's behavior, meanwhile, became more bizarre: she began conducting what she called "lock-ins," during which she would lock Silfredo in the home and forbid him from going outside, telling him that it was dangerous for him to step beyond the front gate. As a result, Silfredo, who was already shy and emotionally repressed, found himself increasingly isolated from his peers and made few friends. He was often left in his aunt's care while Marisol worked long hours, but was also frequently left home alone. After his younger sister was born, Silfredo, barely a teenager, became responsible for raising her when his mother and aunt were unavailable.

Silfredo first realized he was gay when he was ten years old. In a culture characterized by machismo and homophobia, shy and effeminate Silfredo was subjected to relentless bullying at school for his affect and mannerisms. Boys and girls alike mocked him, beat him up, and called him a "faggot." Making matters worse, Silfredo's mother and aunt were devoutly religious. Silfredo knew they would not be accepting of his sexuality, and to this day he has not come out to them. ████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

When he was fifteen, Silfredo was sent to Florida to live with an aunt after his father sponsored him. The transition to a new country was jarring: he did not speak English and learned the language as best he could by watching television shows. Silfredo struggled academically and failed several classes. Ex. C at 14-15; Ex. E at 2. Still mocked for his sexuality, he was now also picked on for being

an "outsider" who could not speak English. He made few friends. He met his younger half-sisters, but in the rare instances when he saw his father, Jose was drunk.

During his first year living with his aunt, fifteen-year-old Silfredo met a male classmate who showed romantic interest. One afternoon, Silfredo's aunt walked in on Silfredo and the classmate kissing. Silfredo's devoutly religious aunt responded with horror and told Silfredo that being gay was abnormal and wrong. Silfredo became deeply ashamed and decided to "close off that phase" of his life. Ex. D at 3. For the next seventeen years he had no romantic partners and did not go on a single date. Pornography became his only sexual outlet, and he began watching gay adult pornography several hours per week.

Continuing to struggle in school and becoming increasingly isolated, Silfredo was sent back to the Dominican Republic and spent the next few years shuttling between countries and cultures. He made some friends in high school in the Dominican Republic, but the friendships did not last due to his frequent relocations. After graduating from high school he returned to his aunt's home in Florida, working odd jobs and lacking a social network outside of his family. At eighteen, he heard a rumor that his cousin in the Dominican Republic was bisexual and had had an affair with a male teacher. Not long after that the cousin was shot to death, an event that devastated Silfredo and threw him into a depression that lasted several years.

Mr. Castillo eventually moved to New York and reunited with his father. His relationship with Jose remained awkward and emotionally distant. Needing work, Mr. Castillo took a job in a joint daycare/after-school program run by his Jose's girlfriend's mother. He finally began to hit his stride: he became a citizen, earned certifications in childcare, and became a part-owner of the company. He used his earnings to support his mother and sister in the Dominican Republic. Yet he still lacked social connections outside of his co-workers and immediate family, had little emotional support, and was unable to be honest with anyone about his sexuality.

### B. The circumstances leading to the offense conduct.

Awkward, socially anxious, and sexually repressed, Mr. Castillo used pornography as his only sexual outlet. He initially watched gay adult pornography several hours per week. In his late twenties, however, he began to communicate with other men on group chats and Telegram, and those men would send him files containing large numbers of pornographic images. Some of the images depicted adult men having sex with children. When he first began to look at these images, Mr. Castillo was primarily attracted to the adult men and was more curious than anything about the children. As he began to view more and more of the images, his "confusion turned to intrigue." Ex. E at 3. As Mr. Castillo describes it now, "Maybe I was addicted to the images." *Id.* As the pandemic began and society shut down, Mr. Castillo, increasingly isolated and now experiencing frequent panic attacks, began to view child pornography compulsively, in the process becoming desensitized to the thought of having sexual contact with a child. Ex. D at 5; Ex. E at 2-3. The tragic result of that desensitization was that he recorded himself having oral sex with an eleven-year-old boy who was enrolled in the after-school program. He did not share that recording with anyone else.

In 2022, 32-year-old Mr. Castillo was arrested and charged in Bronx Supreme Court with state crimes related to his sexual contact with the victim. During a search, law enforcement found unrelated child pornography on Mr. Castillo's electronic devices; there was no evidence that Mr. Castillo had created or shared any of those images. Following a thorough investigation by state and federal law

enforcement, no other children in the daycare of after-school program claimed to have been subject to any misconduct.

Having never spent even a night in jail, ███████████████████████████
████████████████████████████████████████████████████████████████
█████████████████████████████████████████████ A year after he was taken into state custody, Mr. Castillo was charged in federal court and transferred to MDC Brooklyn. Despite relating to the same conduct, his state charges remained pending.

**C. The expert evaluations shed light on Mr. Castillo's mental health issues, his low risk of recidivism, and the factors that contributed to his actions.**

1. *The neuropsychological report.*

Upon meeting Mr. Castillo, it was apparent both to me and social worker Brittany Larson that he had undiagnosed mental health issues and possible learning deficits: he had difficulty answering open-ended questions, appeared to have stunted emotional development, had poor insight and self-awareness, and was remarkably anxious.  At our request, Dr. Mary Cohen and her partner evaluated Mr. Castillo to determine if he was on the autism spectrum.  They met with Mr. Castillo, conducted collateral interviews, and reviewed available records to reach their conclusions.

[redacted paragraph]

[redacted paragraph]

[redacted paragraph]

### 2. *The psychosexual evaluation.*

In October 2023, forensic psychologist Dr. Leonard Bard conducted a psychosexual evaluation of Mr. Castillo. As Dr. Bard notes in his report and consistent with what Dr. Cohen emphasized, during the first meeting Mr. Castillo "had a great deal of difficulty responding to this examiner's questions," particularly those related to his sexuality. Ex. D at 5. In a follow-up meeting, however, Mr. Castillo began to up about his sexuality and became "more comfortable in responding to difficult and introspective questions." *Id.* at 7. Mr. Castillo's noticeable progress indicated to Dr. Bard that Mr. Castillo "would appear to be someone who can benefit from sex offender treatment in the future." *Id.*



*Id.*

### 3. *The social work report.*

For over a year, Mr. Castillo has worked closely with Brittany Larson, a licensed clinical social worker with the Federal Defenders. Ms. Larson's report, attached as Exhibit E, reveals Mr. Castillo's remarkable growth over the last year as he has struggled to gain insight into his behavior and reckon with the immense regret he feels over his conduct and its impact.

During their initial meetings, Mr. Castillo struggled to open up about both his background and emotions. He was anxious and hesitant, particularly when it came to discussing his sexuality. Through a variety of exercises similar to those utilized in therapy and sex offender treatment – journaling, the use of directed questions, and employing written prompts – Mr. Castillo began to gain insight and open up. Ex. E at 4.



### D. Mr. Castillo's acceptance of responsibility, profound remorse, and efforts at self-improvement.

Mr. Castillo has endured over two years of pre-trial incarceration at two notoriously dysfunctional and violent institutions, Rikers Island and MDC Brooklyn. The fifteen months he has spent at MDC Brooklyn have been particularly jarring, as Mr. Castillo – a sensitive man with no criminal record – witnessed violence, endless lockdowns, and inhumane conditions. He lost over fifty pounds and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Yet despite these conditions, he accrued only one minor disciplinary infraction for standing in the wrong spot. Meanwhile, he worked as an orderly and tutored other inmates. He completed twenty educational and vocational programs, earned his GED, and was awarded a certificate of appreciation from the jail's education department.

Mr. Castillo has also spent his time at the MDC struggling to reckon with his offense conduct. He consistently requests and reads books about trauma and the impact sexual abuse can have on

victims. His sessions with Ms. Larson reveal someone who is "trying, desperately, to find answers and not regress into avoidance and denial." Ex. E at 4. One outlet for Mr. Castillo has been poetry. Many of Mr. Castillo's poems surround the topic of "evil," as he attempts to synthesize his crime with the redeemability of his own humanity.



On March 21, 2024, Mr. Castillo appeared before the Court and pled guilty to one count of sexual exploitation of a child, in violation of 18 U.S.C. § 2251(a). He waived indictment, and did not request discovery or file any motions. Mr. Castillo expressed his remorse for his actions, remorse which he reiterates in his attached letter to the Court. Ex. A.

Subsequently, on May 28, 2024, Mr. Castillo pled guilty in state court to first-degree criminal sexual act, use of a child in a sexual performance, and lesser included offenses, based on the same conduct underlying the federal conviction. In exchange for his guilty plea, the state court has promised him a twenty-year prison sentence, to run concurrently with his federal sentence. Ex. F at 8. Sentencing in the state is scheduled for July 2. In discussing her decision to offer a plea with a promise of concurrency with the federal sentence, the state prosecutor explained the offer was being made "with the knowledge, appreciation and support of the child's mother in this case." *Id.* at 4. She added:

> It brings the mother and this teenage boy enormous relief to know that this defendant is willing to accept accountability and, concurrently, that his acknowledgment of accountability would spare this now grown child from having to testify.

*Id.* at 6.

## II. THE APPROPRIATE SENTENCE IS 180 MONTHS' INCARCERATION.

Although the Court must consider the advisory guidelines sentencing range, the "Guidelines are guidelines – that is, they are truly advisory." *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010) (citations omitted). "Even where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant." *Id.* at 182. Rather, the Court must conduct an "independent review of the § 3553(a) sentencing factors." *Id.*

Under 18 U.S.C. § 3553(a), the Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of criminal sentencing. Since courts must "consider every convicted person as an individual," the sentence imposed must "fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (citations omitted). As such, the Court must evaluate factors including, among other things, the "nature and circumstances of the offense and the history and characteristics of the defendant"; "the need to avoid unwarranted sentencing disparities";

and the need for the sentence to provide just punishment, afford adequate deterrence, and protect the public. 18 U.S.C. § 3553(a)(1)-(7).

Here, a 180-month sentence would be sufficient in light of Mr. Castillo's difficult upbringing, which included untreated mental health issues and repression of his sexuality; his lack of criminal record; his sincere remorse; his remarkable efforts at rehabilitation; his low risk of recidivism and strong prospects for treatment; and the inhumane conditions he has endured at the MDC for more than a year. Such a sentence would satisfy the statutory purposes of punishment and be consistent with sentences imposed for similarly situated individuals in this District.

### A. Mr. Castillo's history and characteristics, and the nature and circumstances of the offense, support a 180-month sentence.

As detailed above, Mr. Castillo experienced a troubled upbringing that, in the opinion of multiple experts, contributed to his underlying mental health issues and the offense conduct. The child of an absentee, emotionally distant, alcoholic father and a mentally ill and borderline abusive mother, Mr. Castillo's childhood was characterized by instability. The chaos he experienced – "lock-ins," physical violence, isolation from his peers, being repeatedly shuttled between the Dominican Republic and United States – ███████████████████████████████████████████████████████████████████████████████████████████████████████

It was not only Mr. Castillo's emotional development that was stunted, however. Through the rejection of his peers and deeply religious teachings of his family, Mr. Castillo grew up suppressing his sexuality. Effeminate and artistic, his classmates bullied him relentlessly, hurling homophobic slurs at him. His family made clear that homosexuality was an unforgiveable sin, driving Mr. Castillo further into the closet. ███████████████████████████████████████████████████████████████████████████████████████████████████████
After his aunt discovered him kissing a boy at fifteen years old and castigated him for it, Mr. Castillo buried his sexuality, forming no romantic attachments and instead becoming dependent on pornography. Mr. Castillo became overwhelmed with shame.

The confluence of all these factors led to what Dr. Mary Cohen observed to be a form of "arrested development." It is hard to think of a term that more aptly describes Mr. Castillo: as both I and social worker Brittany Larson have observed in more than a year working with him, speaking with Mr. Castillo can often resemble speaking with someone with the emotional and cognitive reasoning of a teenager. He struggles to speak about his feelings; he can be shy and awkward; he finds it difficult to speak about himself, often describing his experiences through the lens of idioms or the publicized experiences of celebrities; he tends to minimize his own emotions even under stressful circumstances so that his interlocutor is not made uncomfortable; yet he can also unexpectedly reveal an entire world of emotional turmoil that has been bubbling up under the surface.

One can only imagine the kind of productive life Mr. Castillo could have led with a supportive family and treatment from mental health professionals. With his untreated mental health issues and unfortunate shame about his sexuality, however, Mr. Castillo became addicted to pornography as his only sexual outlet. Through group chats he was exposed to child pornography. He became desensitized, with the tragic outcome being the charged conduct in this case. Nothing can excuse the awful act Mr. Castillo committed, and he has never tried to minimize its impact on the victim. But

for someone with Mr. Castillo's history and characteristics – his lack of any prior record, his mental health struggles, his difficult upbringing – a 180-month sentence is sufficient punishment.

Similarly, a 180-month sentence is warranted considering the nature and circumstances of the offense. It is always difficult to discuss the "nature and circumstances of the offense," particularly a sex offense, without seeming as though the crime is being minimized. That is not our intention at all; he committed an inexcusable crime, and the victim was a child entrusted to his care who suffered serious harm. There are, however, certain mitigating factors about the offense that the Court must consider under § 3553(a). Mr. Castillo committed the charged crime while suffering from untreated mental health issues, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. With regard to the charge to which he pled guilty, Mr. Castillo did not share the images he recorded of the victim with anyone. And the contact offense he committed has already been punished severely in the state with a forthcoming twenty-year sentence.[1] While the circumstances of Mr. Castillo's offense are obviously inexcusable, they are simply the kinds of circumstances that warrant higher than a fifteen-year mandatory minimum for a first offense, particularly for an individual who pled guilty without even being indicted.

And critically, Mr. Castillo has shown extraordinary remorse for his actions, and has demonstrated a real commitment to change over the last two years. He pled guilty in state court knowing he would receive a twenty-year sentence. In federal court he waived indictment, discovery, motions, and trial. He has expressed deep, genuine regret both for what he did and the lasting harm he has caused the victim. Notably, his acceptance of responsibility has brought the victim and the victim's family "enormous relief." Ex. F at 6. As he explains in his attached letter:

> Most of all I want to apologize to the person I harmed and to the parents. I am not asking for forgiveness, because before I can do that I believe I must first be able to forgive myself, and forgive myself for everything: making poor choices, acting without thinking, and knowing that it was wrong and still going through with it. But I understand now that the only way I can work towards forgiving myself is by understanding myself and my actions, and work on becoming a better person.

Ex. A.

Mr. Castillo has indeed worked hard to gain insight into his behavior and ensure that nothing like this ever happens again. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ He has had weekly sessions with a

---

[1] The pre-sentence report contains an unfounded allegation by the victim's mother that there may have been other victims. Mr. Castillo vigorously objects to the Court considering such an assertion at sentencing. There was a thorough investigation during which law enforcement spoke with every child in the after-school program, and most of their parents, and no one alleged any misconduct whatsoever. Had there been other victims, the government would certainly have charged that conduct, and the Court should therefore disregard the speculation of the victim's mother in this regard.

licensed clinical social worker, Brittany Larson, where he has explored the triggers for his behavior and started to grapple with the issues and trauma he has faced throughout the years. Such weekly sessions are not standard for our social workers, but Mr. Castillo's commitment to counseling and rehabilitation were extraordinary enough to warrant it. He has completed twenty programs at an institution that barely offers any programming. And importantly, he has embraced his sexual orientation, worked to overcome his entrenched shame, and is beginning to broach that sensitive topic with his family – something that will ensure he is able to engage in healthy relationships after his eventual release. Mr. Castillo's efforts stand as proof of Dr. Bard's assessment that he has a strong prognosis for treatment going forward.

Mr. Castillo understands he must be punished for what he did and the harm he caused. A 180-month prison term is, for a first-time offender with Mr. Castillo's history and characteristics, a heavy sentence. Considering Mr. Castillo's background, his efforts at rehabilitation, and the circumstances of the offense, it is sufficient.

### B. The purposes of punishment would be satisfied by a 180-month sentence.

A 180-month sentence would satisfy the purposes of punishment laid out in 18 U.S.C. § 3553(a)(2). First, such a sentence would be sufficient to deter future misconduct and protect the public. *Id.* § 3553(a)(2)(B)-(C). According to Dr. Bard's psychosexual report, Mr. Castillo scores as a low-to-moderate risk of re-offense on the STATIC-99R assessment. This equates to an "estimated group recidivism rate of 12.8% over a period of 5 years." Ex. D at 6. Dr. Bard further adds that Mr. Castillo does not display the qualities typically indicative of reoffending and "appears to have the motivation and desire to make the necessary changes in his life to reduce his risk of re-offense as the result of successful treatment." *Id.* at 8. He is not someone who is likely to commit another sex offense in the future.

And considering he will soon be sentenced to twenty years in state prison, Mr. Castillo will be nearly fifty years old when he first becomes eligible for release, and at a much lower risk of recidivism statistically. United States Sent'g Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* at 24-27 (Dec. 2017) (showing a decrease in recidivism rates across all relevant categories for offenders released before and after age 50). When he is released, he will be under both federal and state supervision for years and will be on the sex offender registry. And he will be engaging in the treatment he desperately needs. *See* United States Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* at 278 & n.31 (2012) ("appropriate 'treatment interventions . . . are associated with lower rates of recidivism – some of them very significant'"). He will, moreover, have the support of his family members, many of whom love him deeply and have written letters on his behalf. Ex. B. It is not necessary to keep Mr. Castillo in prison beyond the twenty years he will serve for his state conviction to protect the public.

Second, a 180-month sentence is sufficient to provide Mr. Castillo with "needed educational or vocational training, medical care, or other correctional treatment." 18 U.S.C. § 3553(a)(2)(D). In just a short time, Mr. Castillo has already earned his GED and completed twenty educational programs. He will have twenty years in state prison to continue to his educational development. He also intends to participate in correctional sex offender treatment. Sentencing him to more than the twenty years he will serve in state prison will not further his access to treatment, which he looks forward to continuing in the community.

And a 180-month sentence would be "just punishment." In that respect, it must be noted that Mr. Castillo has been incarcerated at MDC Brooklyn for fifteen months, after spending a year at Rikers Island. As courts in this District have noted, the "conditions at the MDC are dreadful in many respects." *See United States v. Chavez*, 22-Cr-303, ECF No. 31, at 9 (S.D.N.Y. 2024). Mr. Castillo has experienced many of the inhumane, third-world horrors federal inmates face at MDC Brooklyn, and has done so while striving to access mental health care. He witnessed an inmate on his unit nearly die from a seizure while correctional officers never responded to cries for help; he has shown me the packages from expired food the jail has served him; just last week there were multiple stabbings and two inmates reportedly died. The fifteen months he has spent at the MDC – following a year at Rikers Island, itself a dysfunctional wreck – are already far beyond the punishment individuals in any other jurisdiction in this country face, and beyond what Congress or the Sentencing Commission ever envisioned. Those conditions should be factored in when determining whether a sentence higher than the mandatory minimum of 180 months is appropriate for Mr. Castillo.

### C. A 180-month sentence would not create unwarranted sentencing disparities.

Over the last five fiscal years, seventeen people similarly situated to Mr. Castillo – sentenced for a sexual abuse offense under § 2G2.1 and in criminal history category I – have been sentenced in the Southern District of New York. The average imprisonment length has been 163 months, with a median imprisonment length of 180 months.



*See* U.S. Sentencing Commission, Interactive Data Analyzer, https://ida.ussc.gov/. In this context, it must be noted that sex abuse offenses sentenced under § 2G2.1 typically carry mandatory minimum penalties of at least fifteen years' imprisonment. *See* 18 U.S.C. §§ 2251(e), 2260. And since 2015, of the 34 individuals in criminal history category I sentenced under § 2G2.1 in this District, only *three* have received within-guidelines sentences; the remaining 31 all received downward variances or departures.

| Sentence Range | 2015 | | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | 2023 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % | N | % |
| Grand Total | 5 | 100.0% | 2 | 100.0% | 2 | 100.0% | 7 | 100.0% | 4 | 100.0% | 2 | 100.0% | 4 | 100.0% | 3 | 100.0% | 5 | 100.0% |
| Within Range | - | - | - | - | 1 | 50.0% | 1 | 14.3% | 1 | 25.0% | - | - | - | - | - | - | - | - |
| Non-Govt Downward Departure | - | - | 1 | 50.0% | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Downward Variance Govt Motion | - | - | - | - | 1 | 50.0% | - | - | 1 | 25.0% | - | - | 1 | 25.0% | 1 | 33.3% | 1 | 20.0% |
| Non-Govt Downward Variance | 5 | 100.0% | 1 | 50.0% | - | - | 6 | 85.7% | 2 | 50.0% | 2 | 100.0% | 3 | 75.0% | 2 | 66.7% | 4 | 80.0% |

*See* U.S. Sentencing Commission, Interactive Data Analyzer, https://ida.ussc.gov/.

The data strongly implies that, in this District, first-time offenders convicted of sex abuse offenses are sentenced at or near the mandatory minimum, and sentences approaching the statutory maximum are few and far between. As such, a 180-month sentence in Mr. Castillo's case would be consistent with the sentencing practices in this District, and would not create an unwarranted sentencing disparity.[2] By contrast, a sentence greater than 180 months – and certainly a guidelines sentence of the statutory maximum 360 months' imprisonment – would result in Mr. Castillo being sentenced far more harshly than similarly situated individuals.

### III. THE COURT SHOULD ORDER THE SENTENCE TO RUN CONCURRENTLY WITH THE ANTICIPATED SENTENCE IN MR. CASTILLO'S PENDING STATE CASE.

Mr. Castillo's case began as a state prosecution related to Mr. Castillo's contact offense with the victim and recording of that encounter. After the state charges had been pending for a year, federal prosecutors indicted him for the same conduct, adding separate child pornography possession charges. Although the conduct underlying their indictment was now charged federally, state prosecutors did not dismiss Mr. Castillo's state case.

Mr. Castillo has pled guilty federally to recording his sexual encounter with the victim. He pled guilty to the same conduct in the state, and will be sentenced to twenty years' imprisonment there on July 2. The state court has promised Mr. Castillo concurrent time with his federal sentence, and the federal prosecutors are not seeking consecutive time in the instant case. Since the federal charges to which Mr. Castillo pled guilty are substantially the same as those in the state, the Court should sentence Mr. Castillo to concurrent time with his anticipated twenty-year state sentence. Such a

---

[2] Mr. Castillo has provided a written objection to Probation regarding the inclusion of the results from the JSIN tool in his PSR. The JSIN results fail to reveal the distribution of sentences (ie. how many individuals received sentences above or below the mean), meaning even a small number of outliers can dramatically skew the results upward in an inaccurate fashion. The results evade peer review, as the software relies on dynamic data that is constantly changing. And the data reflects only national rather than District-specific sentencing. The JSIN tool is, therefore, statistically unreliable and irrelevant as applied to Mr. Castillo. U.S. Const. amend. V; 18 U.S.C. § 3553(a).

sentence would not only be just, but would give effect to the plea agreements reached by the parties both here and in the state.

When a federal defendant has pending state charges, the District Court is empowered to order the defendant's federal sentence to run concurrently with the anticipated state sentence. *Setser v. United States*, 566 U.S. 231, 234-44 (2012). In determining whether to run the federal sentence concurrently or consecutively, the Court is required to consider the § 3553(a) factors. 18 U.S.C. § 3584(b). But when the "state term of imprisonment is anticipated to result from another offense that is relevant conduct to the instant offense of conviction," the Sentencing Guidelines contemplate that the "sentence for the instant offense shall be imposed to run concurrently to the anticipated term of imprisonment." U.S.S.G. § 5G1.3(c).

Here, the Court should order Mr. Castillo's federal sentence to run concurrently with the twenty-year state sentence that will be imposed on July 2, under Bronx Indictment No. IND-72452-22/001. The charges to which Mr. Castillo pled guilty there are the same as those that underlie the federal conviction, and thus § 5G1.3(c) recommends concurrent time.[3] As a matter of fundamental fairness, Mr. Castillo should not be subjected to consecutive prison terms for the same conduct simply because he was charged in both state and federal court. Indeed, aside from the desire to obtain a conviction, it is unclear why state prosecutors did not dismiss the charges there after Mr. Castillo was indicted federally (as is the norm), nor is it clear why federal prosecutors chose to bring an indictment in this District after the state charges had been pending for over a year.

Likewise, the 3553(a) factors support a concurrent sentence. As discussed above, a 180-month sentence would be sufficient to punish Mr. Castillo for his actions, and would be in keeping with the typical sentences imposed in this District for similar conduct. Mr. Castillo is already going to serve more than that as a result of his state sentence – 240 months. Sentencing him to consecutive time would result in an aggregate sentence of 35 years or more for his conduct, a sentence that would be greater than necessary, unduly punitive, and out of keeping with the normal sentences imposed in this District for similar conduct. Notably, every actor involved in Mr. Castillo's prosecution agrees that consecutive time would be inappropriate: the state prosecutors, who made concurrency part of their plea agreement; the state judge, who promised concurrent time; and the federal prosecutors, who promised not to seek a consecutive term as part of their plea offer. Even the victim's mother apparently approved the offer in the state, which included both a promise of concurrent time and a sentence less than the statutory maximum.

Because Mr. Castillo was brought into state custody on a writ, and therefore is technically still in state custody, effectuating a concurrent sentence requires the Court to include three directives in the judgment. First, the Court must order the federal sentence to run concurrently with the anticipated state sentence; otherwise, the sentence will run consecutively by operation of law. 18 U.S.C. § 3584(a). Second, the Court must designate the state prison for service of the federal sentence; otherwise, the BOP will not begin to run the federal sentence until the state term expires. 18 U.S.C. § 3621(b); *Setser*, 566 U.S. at 235. And third, the Court must order the federal sentence to commence immediately;

---

[3] Although Mr. Castillo stipulated to possessing unrelated child pornography, and the Court may consider that conduct at sentencing as part of its § 3553(a) analysis, the government is dismissing those counts as part of the plea agreement. And his possession of unrelated images – clearly the result of an addiction and unresolved mental health issues – does not warrant additional prison time, particularly in light of the already harsh mandatory minimum he faces and the well-known criticisms of the child pornography possession guidelines. *See, e.g., United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010).

otherwise, the BOP will not begin to run the federal sentence until the state term ends and Mr. Castillo arrives at the federal facility, or it may deny him credit against the federal sentence for the two years he has spent in pretrial "state custody" (including his year at the MDC). 18 U.S.C. § 3585(a)-(b). Absent these three directives, Mr. Castillo's sentence will be calculated consecutively rather than concurrently. *See* Henry J. Sadowski, *Federal Sentence Computation Applied to the Interaction of Federal and State Sentences*, The Champion (Apr. 2014) (attached as Exhibit G).

The Court should, therefore, order that (1) Mr. Castillo's federal sentence run concurrently with the anticipated sentence in Bronx Indictment No. IND-72452-22/001, (2) the state prison be designated for service of the federal sentence, and (3) the federal sentence commence immediately.

### IV.    CONCLUSION.

At just 34 years old, and with no prior criminal record, Mr. Castillo is looking forward to obtaining the treatment he needs to overcome his deep-seated issues and lead a law-abiding life after his eventual release from prison. Since his arrest, he has engaged with meaningful, intensive mental health treatment, while locked in an institution whose dysfunction knows no bounds. He knows he needs to be punished for the awful thing he did. As he explains while again apologizing for "the harm I caused":

> I know no sin goes unpunished, and I accept any punishment you see fit. I will take that time to reflect on my actions and rehabilitate myself. I promise that this won't be the definition of who I am.

Ex. A. Mr. Castillo is going to spend twenty years in state prison for his actions. Under the circumstances, twenty years is enough.

Silfredo Castillo Martinez is committed to getting better. He is a person suffering from previously untreated mental illness, who made a terrible mistake. He is working hard to make things right. A sentence of 180 months, concurrent with his twenty-year state sentence, is sufficient in this case.

Sincerely,

Michael Arthus
Assistant Federal Defender
212-417-8760

cc. (by ECF): AUSA Jackie Delligatti